Filed 5/27/21
*See concurring opinion*

**CERTIFIED FOR PUBLICATION**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| DORA LEON, | E073781 |
| Plaintiff and Appellant, | |
| v. | (Super.Ct.No. RIC1722990) |
| COUNTY OF RIVERSIDE, | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County.  Daniel A. Ottolia, Judge. Affirmed.

Law Office of Steven Zwick, Steven Zwick and James Alquist for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Arthur K. Cunningham, Jeffry A. Miller and Lann G. McIntyre for Defendant and Respondent.

### I.  INTRODUCTION

Plaintiff and appellant Dora Leon's husband, José Leon, was shot and killed by a neighbor in a driveway of a mobilehome park in Cherry Valley, where Dora and José

lived.[1]  Riverside County Sheriff's deputies unsuccessfully attempted to revive José but, before doing so, one of the deputies dragged José's body several feet and, in the process of being dragged, José's pants fell to his thighs, exposing his genitals.  José's body lay, with his genitals exposed, for around eight hours while sheriff's deputies and other law enforcement officers evacuated the mobilehome park, located the shooter who had shot himself dead, and continued investigating the shooting.  José's body was not removed until shortly after the coroner arrived on the scene and completed processing the body.

In this action, Dora sued the County of Riverside, alleging a single cause of action for negligence, sounding in negligent infliction of emotional distress, based on the failure of Riverside County Sheriff's deputies to promptly cover José's exposed body, or remove the body from the scene, while deputies evacuated the mobilehome park, searched for the shooter, and investigated the shooting.  The trial court granted the county's motion for summary judgment on Dora's first amended complaint (FAC).  In this appeal from the judgment in favor of the county, Dora claims that the deputies who responded to the shooting, and the county as the deputies' employer, owed Dora a duty of care not to allow José's body to lie exposed while deputies and other law enforcement officers secured the area and investigated the shooting.  We affirm.

The county is immune from liability to Dora for any negligence or other tortious conduct on the part of the deputies in failing to promptly cover José's body, or promptly remove José's body from the crime scene.  Undisputed evidence shows that the deputies'

---

[1]  For ease of reference, and with no disrespect intended for the informality, we refer to Dora and José Leon by their first names.

2

negligence, if any, occurred during the course of the deputies' official investigation of the shooting. For this reason, the deputies are immune from liability to Dora (§ 821.6),[2] and, the county, as the deputies' public entity employer, is immune from vicarious liability for the deputies' negligence, if any. (Gov. Code, §§ 815.2, subd. (b), 821.6.)

## II. FACTS AND PROCEDURE

### A. *The Allegations of the FAC*

In her FAC, Dora alleges a single cause of action against the county for negligence. She alleges that, after José was shot and killed, Riverside County Sheriff's deputies allowed his body to lie, with his genitals exposed, in full public view for approximately eight hours. Dora suffered "extreme emotional distress" at seeing José's "dead and bloody body so clearly publicly exposed," and seeks unspecified general damages. She alleges that the deputies, and the county as their employer, had a duty under Civil Code section 1714 and the factors enunciated in *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*) not to allow José's body to lie exposed to the public while the deputies investigated the shooting.

### B. *The County's Motion for Summary Judgment*

The county moved for summary judgment on the FAC on two grounds: (1) the county did not owe Dora a duty of care to cover José's body; and (2) under Government Code provisions, including sections 815, subdivision (a), 815.2, subdivision (b), and 821.6, the county was immune from liability to Dora for the deputies' tortious conduct, if

---

[2] Unspecified statutory references are to the Government Code

3

any, in failing to promptly cover or remove José's exposed body. The county further argued, in its defense, that the deputies had a statutory duty not to "disturb or move" José's body until the coroner had completed processing the body and gave the deputies permission to disturb or remove it. (§§ 27491, 27491.2.)

In opposition, Dora argued that the deputies and the county owed her a duty to cover José's exposed body, and the public policy of protecting Dora's "emotional sensibilities" supported a cause of action for negligent infliction of emotional distress. The trial court granted the county's motion, reasoning that the county met its initial burden of showing that it was immune from any liability to Dora under sections 815.2, subdivision (b), and 821.6, and that Dora did not raise a triable issue of material fact because she did not cite any applicable authority to rebut the county's immunity argument.

C. *Undisputed Facts*[3]

On March 25, 2017, Dora was living in a mobilehome, space No. 98, in a mobilehome park in Cherry Valley. Around 10:40 a.m., a man who lived across the street from Dora, in space No. 97, shot Dora's husband José in the chest near the driveway of space No. 96. José fell, facedown, in the driveway of space No. 96.

Around 10 minutes later, a Riverside County Sheriff's deputy (the first deputy) arrived at the scene. The first deputy stepped out of his vehicle, drew his weapon, and asked a crowd of people who had gathered in the street whether any of them had seen

---

[3] The undisputed facts are based on the parties' separate statements of undisputed and disputed material facts and the evidence adduced in support of those facts.

4

who had shot José, but none of the people answered. A man who lived in the mobilehome in space No. 96 was kneeling near José and told the first deputy that he did not know who had shot José, but the shooter ran away, leading the first deputy to believe the shooter was no longer in the area.

When he first arrived on the scene, the first deputy believed that José was dead because there was a large pool of blood around José's upper torso, and José was neither breathing nor actively bleeding. Still, the first deputy put on sterile gloves and retrieved a trauma shooting kit from his vehicle to "make a showing" to the people who had gathered that he was trying to help José. The first deputy had heard that other deputies had been criticized for not trying to render aid to victims, and the people nearby were unable to see that José was already dead. In any event, the first deputy was unable to render any aid to José and did not even touch José because, just as he knelt down near José, three gunshots rang out from the mobilehome in space No. 97.

After the gunshots were heard, the first deputy told the people who were nearby to leave the area. Dora, one of her daughters, and her grandchildren were also in the area and were told to leave. Dora protested that she was not going to leave her husband, but she was told she would be arrested if she did not leave. Dora went to stay in a neighbor's mobilehome, in space No. 76, until she and others were evacuated to a local high school.

Another sheriff's deputy (the second deputy) arrived just before 11:00 a.m. The first deputy told the second deputy that he believed José was dead, then moved the second deputy's SUV between José's body and space No. 97 to create cover between the shooter, on one side, and José and the deputies, on the other. The second deputy then

5

turned José onto his back and dragged him, by his arms, behind the SUV—a distance of approximately three feet. As José was being dragged, his pants moved down to his thighs, exposing his genitals.

After attempting chest compressions, the second deputy pronounced José dead at 11:02 a.m. José's body lay where it was dragged, with his genitals exposed, until around 6:20 p.m. At that point, the coroner had completed collecting evidence and had processed the body, and the body was removed from the scene.

Shortly after José was pronounced dead at 11:02 a.m., several more deputies and other law enforcement officers, including SWAT team members, arrived. Because the shooter had not been located and it was still "an active [shooting] scene," SWAT team members set up a perimeter around the mobilehome park. The mobilehome park was evacuated, and its residents were relocated to a local high school. Around the time the first deputy arrived, an ambulance arrived outside the park, but law enforcement officers would not allow the ambulance inside the park.

Around 2:40 p.m., SWAT team members entered the mobilehome in space No. 97, where they found the shooter dead from a self-inflicted gunshot wound. A handgun was found next to the shooter's body. It was then apparent that the shooter had shot himself around 11:00 a.m., when three gunshots were heard coming from inside the mobilehome in space No. 97.

Around 3:00 p.m., law enforcement officers went to the local high school, where Dora had been evacuated, and they told Dora that José was dead. As noted, after Dora was told to leave the mobilehome park around 11:00 a.m., Dora and her family members

6

initially stayed in a neighbor's mobilehome in space No. 76, before they were evacuated to the local high school. The neighbor in space No. 76 could see José's body from inside her home. The neighbor went outside and asked the deputies to cover the body, but the deputies did not do so.

The first deputy and the lead investigator explained that José's body was not covered, in part, because a sanitized blanket, cover, or tent was not readily available, and the deputies did not want to contaminate José's body by moving or covering it, although the body had already been turned over and dragged several feet. José's body was also not covered due to the danger that the shooter posed to the deputies. The first deputy and the lead investigator testified in deposition that they did not know why José's body was not covered after the shooter was found dead at 2:42 p.m. Around 11:00 p.m., the park's residents were allowed to return to their homes.

### III. DISCUSSION

#### A. *Standard of Review*

A motion for summary judgment is required to be granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); *Nalwa v. Cedar Fair, L.P.* (2012) 55 Cal.4th 1148, 1153-1154.) A defendant moving for summary judgment bears an initial burden of showing that the plaintiff's causes of action have no merit, and the defendant meets this burden by making a prima facie showing that one or more elements of each cause of action cannot be established, or that there is a complete defense to each cause of action. If the defendant meets this burden, the burden

7

shifts to the plaintiff to produce evidence of a triable issue of material fact concerning the challenged element or defense. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849-851 (*Aguilar*).) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, at p. 850.)

As an appellate court, we review an order granting summary judgment de novo. (*Aguilar*, *supra*, 25 Cal.4th at p. 860.) In conducting our de novo or independent review, we apply the same three-step analysis used by the trial court. We first identify the issues framed by the pleadings; second, we determine whether the moving party has established facts justifying judgment in its favor; and finally, if the moving party has carried its initial burden, we decide whether the opposing party has demonstrated the existence of a triable issue of material fact, justifying the denial of the motion. (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 858-859.) We liberally construe the evidence, and resolve any doubts concerning the evidence, in favor of the opposing party. (*Zubillaga v. Allstate Indemnity Co.* (2017) 12 Cal.App.5th 1017, 1021.)

As noted, Dora's FAC alleges a single cause of action against the county for negligence, sounding in negligent infliction of emotional distress and based on the deputies' act of leaving José's body, with his genitals exposed, in public view for several hours while the deputies and other law enforcement officers secured the area, looked for the shooter, and investigated the shooting. (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 884 [negligence and negligent infliction of emotional distress are not

8

independent torts].) Thus, the issue framed by the FAC is whether the county is liable to Dora for the deputies' negligence, if any, or the county's own negligence, if any, in allowing José's body to remain exposed for several hours.

B. *The County Is Immune from Liability to Dora for the Deputies' Negligence or the County's Negligence, if Any, in Leaving José's Body Exposed (§§ 815, 815.2, 821.6)*

Under the Government Claims Act (§§ 810 et seq.) (the Act), the liability of a public entity for an injury is statutory. "The Act governs all public entities and their employees (§§ 811.2, 811.4) and all noncontractual bases of compensable damage or injury that might be actionable between private persons (§§ 810.8, 814). It establishes the basic rules that public *entities* are immune from liability except as provided by statute (§ 815, subd. (a)), . . . and that public entitles are immune where their employees are immune, except as otherwise provided by statute. (§ 815.2, subd. (b)." (*Caldwell v. Montoya* (1995) 10 Cal.4th 972, 980.)

Section 815, subdivision (a), the cornerstone of the Act, provides that, " 'Except as otherwise provided by statute: (a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person.' " (*Nestle v. Santa Monica* (1972) 6 Cal.3d 920, 932.) An exception to the general rule that public entities are not liable for the acts or omissions of themselves, their employees, or other persons appears in section 815.2, subdivision (b), which provides, "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would,

9

apart from this section, have given rise to a cause of action against that employee or his personal representative."  (§ 815.2, subd. (a).)

    1.  <u>The County's Immunity for the Deputies' Negligence, if Any (§§ 815.2, 821.6)</u>

Our state Court of Appeal has consistently construed section 821.6 as immunizing a public employee from liability for any injury-causing act or omission in the course of the institution and prosecution of any judicial or administrative proceeding, including an investigation that may precede the institution of any such proceeding.  "Because investigation is 'an essential step' toward the institution of formal proceedings, it 'is also cloaked with immunity.' "  (*Amylou R. v. County of Riverside* (1994) 28 Cal.App.4th 1205, 1210 (*Amylou R.*); accord, *Baughman v. State of California* (1995) 38 Cal.App.4th 182, 191-193 (*Baughman*).)

The plaintiff in *Amylou R.*, a 15-year-old girl, was sexually assaulted along with another woman, and the other woman was murdered.  During the official investigation of the crimes, an antagonistic relationship developed between the plaintiff and the investigating officers.  The plaintiff sued the officers' employer, the county, for torts that the officers allegedly committed during the investigation.  (*Amylou R.*, *supra*, 28 Cal.App.4th at pp. 1207-1208.)  *Amylou R.* determined that the county, as the officers' employer, was immune from liability to the plaintiff under sections 815.2 and 821.6.  *Amylou R.* reasoned that the officers' alleged tortious acts all occurred within the course of their investigation of the crimes, and, because an investigation is an essential step toward the institution of formal criminal proceedings, the officers were immune under

10

section 821.6. Accordingly, the county was immune from the officers' alleged torts under section 815.2. (*Amylou R.*, *supra*, 28 Cal.App.4th at pp. 1209-1211.)

Based on "the public policy supporting immunity," *Amylou R.* further held that sections 815.2 and 821.6 immunize public employees and their employers from liability for torts committed by public employees in the course their investigation concerning a judicial or administrative proceeding, even if the plaintiff is not the target of the investigation. (*Amylou R.*, *supra*, 28 Cal.App.4th at pp. 1212-1214.) On this point, *Amylou R.* reasoned that "our system of law enforcement depends upon 'the investigation of crime' " and the "[t]he impartiality of that system requires" that investigating officers be " ' "free to act in the exercise of honest judgment uninfluenced by fear of consequences personal to themselves." ' " (*Amylou R.*, at pp. 1212-1213, quoting *White v. Towers* (1951) 37 Cal.2d 727, 729-730, 732 (*White*), and *Pearson v. Reed* (1935) 6 Cal.App.2d 277, 288; *Scannell v. County of Riverside* (1984) 152 Cal.App.3d 596, 604.) "To eliminate that fear of litigation and to prevent the officers from being harassed in the performance of their duties, law enforcement officers are granted immunity from civil liability, even for the malicious abuse of their power." (*Amylou R.*, at p. 1213, citing *White*, at p. 730.) " ' "[I]n the end [it is] better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." ' " (*Amylou R.*, at p. 1213, quoting *Hardy v. Vial* (1957) 48 Cal.2d 577, 583 (*Hardy*).) Additionally, nothing in the language of section 821.6, its legislative history, or the cases applying it suggested that its immunity did not extend to claims made by nontargets of official investigations. (*Amylou R.*, at pp. 1211-1214, fn.3.)

11

*Amylou R.'s* interpretation of section 821.6 as extending immunity to torts committed by public employees during the course of official investigations was followed in *Baughman.* (*Baughman*, *supra*, 38 Cal.App.4th at pp. 191-193.) In *Baughman*, the plaintiff sued the State of California for its investigating officers' destruction of the plaintiff's property during a search of the plaintiff's rented premises pursuant to a search warrant. (*Id*. at pp. 185-186.) In the course of the search, Cal Poly police officers destroyed floppy computer disks containing the sole source of the plaintiff's research over many years. (*Id*. at p. 186.) *Baughman* reasoned that the officers acted within the scope of their duties when the plaintiff's disks were destroyed because the officers were investigating a crime pursuant to a search warrant concerning such media. (*Id*. at p. 192.) Thus, the officers, and therefore the State, were immune from liability to the plaintiff. (§§ 815.2, 821.6.)

Here, too, the county is immune from liability to Dora for the deputies' negligence, if any, in failing to promptly cover José's exposed body or remove it from the crime scene. All of the evidence adduced on the county's motion for summary judgment shows that the deputies' negligence, if any, in failing to promptly cover or remove José's body from the scene, occurred during the course of the deputies' performance of their official duties to secure the area following the shooting and the deputies' and other law enforcement officers' investigation of the shooting. Thus, the deputies and the county are immune from liability to Dora for the deputies' negligence, if any, in leaving José's body exposed while the deputies and other law enforcement officers investigated the shooting. (§§ 815.2, subd. (b), 821.6.)

12

Dora argues that "continuing to leave José's body exposed for hours after his shooter was confirmed dead at 2:42 p.m. was not in furtherance of the investigation." She points out that, "in a display of candor," the first deputy to arrive on the scene testified in deposition that he did not know why José's pants were not or could not have been pulled back up once the shooter was found dead at 2:42 p.m. and was no longer a threat. But the undisputed evidence shows that the official investigation of the shooting continued for several hours after the shooter was found dead at 2:42 p.m. The coroner did not finish collecting evidence, or processing José's body, until around 5:44 p.m. Around 6:20 p.m., José's body was removed from the scene. Thus, the deputies' negligence, if any, in leaving José's body exposed for several hours occurred during the course of the deputies' and others' official investigation of the shooting.

As the county points out, section 27491.2 also prohibited the deputies from "disturbing or moving" José's body until the coroner gave the deputies permission to do so. The statute provides, in pertinent part, that "the body of one who is known to be dead from any of the causes or any of the circumstances described in Section 27491 shall not be disturbed or moved from the position or place of death without permission of the coroner or the coroner's appointed deputy." (§ 27491.2, subd. (b).) The circumstances described in section 27491 include "all violent, sudden or unusual deaths," and deaths from "known or suspected homicide." Thus, after José was pronounced dead at 11:02 a.m., José's body could not be "disturbed or moved" until the coroner or the coroner's appointed deputy gave permission to do so. This could not have occurred until

sometime after 5:44 p.m., when the coroner, or the coroner's appointed deputy, completed collecting evidence and processing José's body.

Dora argues that section 27491.2, subdivision (b), "provides no defense" to her negligence claim because the second deputy disturbed *and* moved José's body when he dragged it behind the SUV. But when José was dragged, José was not confirmed dead; the first deputy only believed that José was dead. The second deputy ascertained and declared that José was dead at 11:02 a.m., after the second deputy unsuccessfully attempted to revive José by administering chest compressions.

Dora also argues that there was "no good reason" why a blanket or tent could not have been obtained and used to shield José's body from public view, at least after the shooter was found dead inside his mobilehome. Dora maintains that using such a blanket or tent to cover José's body would not have violated section 27491.2, subdivision (b), because it would not have required anyone to disturb or move José's body. But even if any of the deputies who were present in the mobilehome park or investigating the shooting were negligent in failing to obtain such a blanket or tent, or to cover José's body with it, the county is immune from liability for this negligence. (§§ 815.2, subd. (b), 821.6.)

2. The County's Immunity for Its Own Negligence, if Any (§ 815, subd. (a))

The county is also immune from liability for its own negligence, if any, in leaving José's body exposed because no statute imposes liability on the county for its own negligence in a case such as this one. "[T]he rule in this state is that, unless otherwise provided by statute, '[a] public entity is not liable for an injury, whether such injury

14

arises out of an act or omission of the public entity or a public employee or any other person.' (§ 815, subd. (a).) Accordingly, governmental immunity is the rule, and liability is the exception." (*Amylou R.*, *supra*, 28 Cal.App.4th at p. 1213.) No statute provides that the county is liable for its own negligence, if any, in failing to ensure that José's body was covered until the coroner arrived and processed José's body, or until the deputies and other officials completed their investigation of the shooting.

Dora suggests that Civil Code section 1714, subdivision (a), renders the county liable for its own negligence in leaving José's body exposed (Gov. Code, § 815, subd. (a)), but we disagree. The statute provides, "[e]veryone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care . . . ." (Civ. Code, § 1714.) The statute imposes a *general* duty of care on all persons, but it "is an insufficient statutory basis for imposing direct liability on public agencies." (*Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175, 1180, 1183 (*Eastburn*). "[D]irect tort liability of public entities must be based on a specific statute declaring them to be liable, or at least creating some specific duty of care, and not on the general tort provisions of Civil Code section 1714. Otherwise, the general rule of immunity for public entities would be largely eroded by the routine application of

15

general tort principles."  (*Id*. at p. 1183.)[4]

## C.  *Dora's Reliance on* Catsouras[5] *Is Unavailing*

Dora relies on *Catsouras* for the proposition that the deputies who responded to
the scene of the shooting, and the county in its own right, each owed Dora a duty of care
not to allow José's body to lie, with his genitals exposed, while deputies and other law
enforcement officers investigated the shooting and waited for the coroner to arrive,
collect evidence, and process José's body.  As we explain, *Catsouras* is inapposite.

### 1.  The Facts and Holdings of *Catsouras*

In *Catsouras*, surviving family members of an 18-year-old woman who was
tragically decapitated and killed in an automobile accident sued the California Highway
Patrol (CHP) and two CHP officers for various torts, including negligence.  (*Catsouras*,
*supra*, 181 Cal.App.4th at pp. 863, 865-866.)  As a Halloween prank, the two CHP
officers sent images of the decedent's decapitated body to friends and family members of

---

[4]  Dora argues that the behavior of some sheriff's deputies in searching her and other residents' homes on the day of the shooting showed "disrespect, callousness and indifference that violates the underlying public policy of the immunity statutes, such that immunities do not apply here."  In opposing the county's motion, Dora adduced evidence that deputies left Dora's and other residents' homes in disarray after searching the homes after the shooting.  But as the trial court noted, Dora did not plead these allegations in the FAC as a basis for the county's liability, and for that reason the trial court did not consider them.  (See *Bosetti v. The United States Life Ins. Co. in the City of New York* (2009) 175 Cal.App.4th 1208, 1225 [The complaint delimits the scope of the issues before the court on a summary judgment motion, and a party cannot resist summary judgment on a theory not pleaded.].)  We too, disregard these unpleaded claims as a basis for Dora's opposition to the county's motion.

[5]  *Catsouras v. Department of California Highway Patrol* (2010) 181 Cal.App.4th 856 (*Catsouras*).

16

the CHP officers who were not involved in the official investigation of the accident. (*Id.* at p. 865.) The images were then posted on more than 2,500 Internet Web sites, and the decedent's surviving family members—the plaintiffs in *Catsouras*—received e-mails containing the images, along with malicious taunts concerning the decedent. (*Ibid.*) As a result, the plaintiffs suffered severe emotional distress. (*Ibid.*)

The trial court in *Casouras* sustained the CHP officers' demurrer to the plaintiffs' complaint, without leave to amend, and entered judgment on the pleadings in favor of the CHP, but the *Catsouras* court reversed. (*Catsouras*, *supra*, 181 Cal.App.4th at p. 863.) In a thorough analysis, the court determined, among other things, that the plaintiffs stated a negligence cause of action, sounding in negligent infliction of emotional distress, against the CHP and the CHP officers. (*Id.* at pp. 864, 875-876, 881-886.) That is, the defendants owed the plaintiffs, the decedent's surviving family members, a duty "not to place decedent's death images on the Internet for the lurid titillation of persons unrelated to official CHP business." (*Id.* at p. 886.)[6]

*Catsouras* also addressed the separate questions of whether the CHP officers and the CHP were immune from liability to the plaintiffs under the Act. (*Catsouras*, *supra*,

---

[6] In determining that the CHP and the CHP officers owed the plaintiffs this duty of care, *Catsouras* analyzed the factors relevant to determining whether a duty of care exists, as articulated in *Rowland*, *supra*, 69 Cal.2d at page 113. (*Catsouras*, *supra*, 181 Cal.App.4th at pp. 864, 881-885.) Among these factors, the foreseeability of harm to the plaintiff, the moral blame attached to the defendants' conduct, and the policy of preventing future harm were particularly significant. (*Id.* at pp. 864, 884-885.) The court also considered the factors relevant to determining whether a public agency has a duty of care, as articulated in *Thompson v. County of Alameda* (1980) 27 Cal.3d 741 at page 750 (*Thompson*), including the extent of the agency's powers, the role imposed upon the agency by law, and the agency's budgetary limitations. (*Catsouras*, at pp. 881, 885-886.)

181 Cal.App.4th at pp. 888-890.) In considering whether the CHP officers were immune, the court questioned how immunizing the CHP officers would further the public policy concerns underlying section 821.6, as articulated in *Amylou R.* (*Catsouras*, at p. 889.) The court pointedly noted, "[i]t was not in furtherance of the investigation, the preservation of evidence, or any other law enforcement purpose, to deliberately make a mutilated corpse the subject of lurid gossip." (*Id*. at p. 864) The court ultimately concluded that it was inappropriate to resolve, in the context of the CHP officers' demurrer, the factual question of whether the CHP officers' dissemination of the images was in furtherance of the investigation. (*Id*. at pp. 885, 889.)[7] But the court indicated that the complaint alleged sufficient facts to show that the CHP officers' dissemination of the decedent's images was *not* in furtherance of the investigation of the automobile accident. (See *Id*. at p. 889; *Amylou R.*, *supra*, 28 Cal.App.4th at pp. 1209-1211; § 821.6.) Thus, the CHP officers were not immune from liability for their own negligence in disseminating the decedent's images, and the CHP officers' demurrer to the complaint was erroneously sustained.

*Catsouras* also determined that the CHP was not entitled to judgment on the pleadings, essentially because the complaint alleged sufficient facts to show that the CHP

---

[7] For purposes of its discussion of whether the CHP officers owed the plaintiffs a duty of care, the *Catsouras* court noted that the CHP officers had e-mailed the images of the decedent to the CHP officers' friends and family members, but it assumed that the CHP officers did not "personally e-mail" the images "to thousands of Web sites worldwide." (*Catsouras*, *supra*, 181 Cal.App.4th at p. 885.) Still, the court reasoned that it was "perfectly foreseeable" that the CHP officers' e-mails of the images would be forwarded to others "for the purpose of grotesque sensationalism." (*Ibid*.)

was also not immune from liability for the CHP officers' negligence under section 815.2, subdivision (a). (See *Catsouras*, *supra*, 181 Cal.App.4th at p. 890.) The court reasoned that, *if* the CHP officers acted within the scope of their employment in disseminating the images, then the CHP would be vicariously liable for the CHP officers' negligent dissemination of the images under section 815.2, subdivision (a), given that the CHP officers had a duty of care not to disseminate the images as they did. (*Catsouras*, at p. 890.)

### 2. Analysis

Based on *Catsouras*, Dora argues the county and the deputies who responded to the scene of the shooting each owed Dora a duty of care "not to needlessly leave" José's body, with his genitals exposed, "openly visible to the public" for nearly eight hours. It is unnecessary, however, for this court to determine whether the deputies or the county owed Dora such a duty of care. For the reasons explained, the county is immune from liability for the deputies' and the county's own negligence, if any, in leaving José's body exposed.[8] (§§ 815, subd. (a), 815.2, subd. (b), 821.6.)

_____

[8] The county points out that Dora has offered no analysis in her opening brief on appeal of how the *Rowland* or *Thompson* factors support her claims of duty on the part of the deputies or the county. Thus, the county argues that we should deem Dora's claims of duty waived or forfeited in this appeal. (*Roe v. McDonald's Corp.* (2005) 129 Cal.App.4th 1107, 1114 [" '[A]n issue merely raised by a party without any argument or authority is deemed to be without foundation and requires no discussion.' "].) But even if Dora has not waived or forfeited her claims of duty, and either the deputies or the county owed Dora the duty of care that Dora claims they did, the undisputed evidence showed that the county is immune from liability to Dora for the county's and the deputies' negligence, if any, in leaving José's body exposed.

*Catsouras* is also inapposite to, and does not assist, Dora's claim that the county should not be immune from its own or the deputies' negligence in leaving José's body exposed. *Catsouras* involved negligent conduct by a public entity and its employees that, at least allegedly, occurred well outside the course of the public entity's and its employees' investigation. (*Catsouras*, *supra*, 181 Cal.App.4th at pp. 894, 889.) In contrast, any negligence on the part of the county or the deputies in leaving José's body exposed for several hours occurred during the course of the deputies' performance of their official duties and their investigation of the shooting. (*Amylou R.*, *supra*, 28 Cal.App.4th at pp. 1209-1214; *Baughman*, *supra*, 38 Cal.App.4th at pp. 191-193.)

D. *Cases Interpreting Section 821.6 as Immunizing Public Employees from Liability for Torts Committed During Official Investigations, Including Amylou R. and Baughman, Were Not Wrongly Decided*

Dora claims that *Amylou R.*, *Baughman*, and other cases interpreting section 821.6 as immunizing public employees from liability for their tortious acts or omissions in the course of official investigations were wrongly decided. Dora points out that, in *Sullivan v. County of Los Angeles* (1974) 12 Cal.3d 710 (*Sullivan*), our Supreme Court narrowly construed section 821.6 as protecting public employees from liability *only* for malicious prosecution. (*Sullivan*, at p. 715.) She claims that an impermissible discrepancy has arisen between *Sullivan*'s limited interpretation of section 821.6, and numerous subsequent appellate court cases which, over time, have disregarded *Sullivan* and have impermissibly broadened the scope of section 821.6's immunity to torts committed by

20

public employees in the course of official investigations.[9]

We disagree that *Amylou R.*, *Baughman*, and other cases expansively interpreting the scope of section 821.6 's immunity were wrongly decided. We begin by noting that sections 815.2, subdivision (b), and 821.6 were enacted in 1963 as part of the government claims statues formerly known collectively as the Tort Claims Act. (*Asgari v. City of Los Angeles* (1997) 15 Cal.4th 744, 764 (*Asgari*). The statutes continue as part of the subsequently renamed Government Claims Act. (See *City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 734 [adopting practice of referring to the government tort claims statutes as the "Government Claims Act," rather than the informal, "Tort Claims Act"].)

The 1963 enactment of sections 815.2, subdivision (b), and 821.6 codified a common law rule which had immunized both public entities and their public employees from liability for injury caused by an employee's institution or prosecution of any judicial or administrative proceeding, even if the employee acted maliciously and without

---

[9] Although Dora did not raise this claim in opposition to the county's motion in the trial court, we exercise our discretion to consider the claim in this appeal. (*Francies v. Kapla* (2005) 127 Cal.App.4th 1381, 1386.) The county has had an opportunity to respond to the claim in their respondent's brief, and the claim " 'involves purely a legal question which rests on an uncontroverted record which could not have been altered by the presentation of additional evidence.' " (*Noe v. Superior Court* (2015) 237 Cal.App.4th 316, 335.)

The argument that section 821.6 does not immunize public employees from liability for torts they commit in the course of official investigations was the subject of a 2009 law review article by former appellate court attorney and current member of this court, Frank J. Menetrez: Frank J Menetrez, *Lawless Law Enforcement*: *The Judicial Invention of Absolute Immunity for Police and Prosecutors in California* (2009) 49 Santa Clara L. Rev. 393. Dora quotes extensively from the article, in arguing that *Sullivan* means that *Amylou R.*, *Baughman*, and other cases interpreting section 821.6 as immunizing public employees from liability for torts committed during official investigations were wrongly decided.

probable cause. (*Asgari*, *supra*, 15 Cal.4th at pp. 763-764.) *Sullivan* expressly recognized that "section 821.6 codified the recognized common law immunity of prosecutors and other law enforcement officers from malicious prosecution actions, in order to prevent interference with their discretionary and quasi-judicial responsibility for institution and prosecution of enforcement proceedings." (*Sullivan*, *supra*, 12 Cal.3d at p. 722 (dis. opn. of Mosk, J.).)

In *Sullivan*, our Supreme Court specifically addressed whether section 821.6's immunity applied to claims for false imprisonment *in addition to* claims for malicious prosecution. (*Sullivan*, *supra*, 12 Cal.3d at pp. 713, 719-720.) In holding that section 821.6 did not immunize public employees from claims for false imprisonment, the court reasoned that section 821.6 could not be interpreted to defeat another common law rule, preserved in section 820.4, that public employees are *not immune* from liability for false arrest or false imprisonment. (*Sullivan*, at pp. 720-722.) *Sullivan* was not concerned with, and did not address, whether section 821.6's immunity for malicious prosecution extended to torts committed by public employees during the course of official investigations related to judicial or administrative proceedings. (See § 821.6.)

In the years following *Sullivan*, the Court of Appeal has expanded the scope of section 821.6's immunity. For example, the appellate courts have consistently interpreted section 821.6 as not being limited to claims for malicious prosecution, but as extending to other torts, including defamation and intentional infliction of emotional distress. (See, e.g., *Kayfetz v. Cal.* (1984) 156 Cal.App.3d 491, 497 [defamation]; *Kemmerer v. County of Fresno* (1988) 200 Cal.App.3d 1426, 1435-1437 (*Kemmerer*) [intentional infliction of

22

emotional distress], disapproved on other grounds in *Quigley v. Garden Valley Fire Protection Dist.* (2019) 7 Cal.5th 798, 815, fn. 8 (*Quigley*); *Gillan v. City of San Marino* (2007) 147 Cal.App.4th 1033, 1047-1048 [defamation and intentional infliction of emotional distress].)

As noted in *Amylou R.*, the "notion that the immunity provided by section 821.6 is limited to claims for malicious prosecution has been repeatedly rejected." (*Amylou R.*, *supra*, 28 Cal.App.4th at p. 1211, citing *Jenkins v. County of Orange* (1989) 212 Cal.App.3d 278, 283 [social worker immune from liability for negligent investigation of reports of child abuse].) Indeed, because section 821.6 specifies that an employee is immune "even if he acts maliciously," the immunity under the statute "clearly extends to proceedings which were not initiated out of a malicious intent, and thus would not constitute malicious prosecution." (*Amylou R.*, at p. 1211, citing *Johnson v. City of Pacifica* (1970) 4 Cal.App.3d 82, 86-87 [in case predating *Sullivan*, interpreting section 821.6 immunity as encompassing negligence claims].)

Our state appellate courts have also consistently recognized that "investigations are considered to be part of judicial and administrative proceedings for purposes of section 821.6 immunity[,] . . . —even if there is a later decision not to institute administrative proceedings or to initiate a prosecution." (See, e.g., *Richardson-Tunnell v. Schools Ins. Program for Employees* (*SIPE*) (2007) 157 Cal.App.4th 1056, 1062 (*Richardson-Tunnell*), and cases cited, disapproved on other grounds in *Quigley*, *supra*, 7 Cal.5th at p. 815, fn. 8; *Amylou R.*, *supra*, 28 Cal.App.4th at p. 1209-1214; *Baughman*, *supra*, 38 Cal.App.4th at pp. 191-193.) As discussed, *Amylou R.* extended section

23

821.6's immunity to injury caused by a public employee during the course of an official investigation, "even if the person suffering the injury is not the target of that prosecution." (*Amylou R.*, *supra*, 28 Cal.App.4th at p. 1211.)

In reaching that conclusion, *Amylou R.* relied on the absence of legislative history limiting the scope of section 821.6, and on the public policy supporting construing the statute's immunity as applying to torts committed by law enforcement officers in the course of their official investigations. (*Amylou R.*, *supra*, 28 Cal.App.4th at pp. 1212-1213.) That public policy was recognized in California Supreme Court cases predating *Sullivan*, including *White*, *supra*, 37 Cal.3d 727 and *Hardy*, *supra*, 48 Cal.2d 577. (See *Amylou R.*, *supra*, at p. 1213.)

As *White* observed: "When the duty to investigate crime and to institute criminal proceedings is lodged with any public officer, it is for the best interests of the community as a whole that he be protected from harassment in the performance of that duty. The efficient functioning of our system of law enforcement is dependent largely upon the investigation of crime and the accusation of offenders by properly trained officers. A breakdown of this system at the investigative or accusatory level would wreak untold harm." (*White*, *supra*, 37 Cal.2d at pp. 729-730.)

In sum, *Sullivan* was not concerned with and does not preclude an interpretation of section 821.6's express immunity for malicious prosecution *as encompassing* immunity for any tortious injury caused by public employees, including law enforcement officers, in the course of official investigations. "Because investigation is 'an essential step' toward the institution of formal proceedings, it 'is also cloaked with immunity.' "

24

(*Amylou R.*, *supra*, 28 Cal.App.4th at p. 1210, quoting *Kemmerer*, *supra*, 200 Cal.App.3d at pp. 1436-1437.)

Moreover, in *White*, our Supreme Court indicated that the public policy of allowing law enforcement officers to perform their official duties free of "fear of consequences personal to themselves" was inherent in the common law rule immunizing public employees from liability for malicious prosecution. (*White*, *supra*, 37 Cal.2d at pp. 731-732.) This public policy supports construing section 821.6 as encompassing immunity for for injury caused by law enforcement officers and other public employees during the course of their official investigations. (*Amylou R.*, *supra*, 28 Cal.App.4th at pp. 1212-1213; *Baughman*, *supra*, 38 Cal.App.4th at pp. 191-193.)

## IV. DISPOSITION

The judgment is affirmed. The county shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278.)

CERTIFIED FOR PUBLICATION

FIELDS _____
                                                                              J.
We concur:


MILLER _____
            Acting P.J.


RAPHAEL _____
                    J.

[*Dora Leon v. County of Riverside*, E073781]

RAPHAEL, J., Concurring.

The federal courts have identified an astonishing situation regarding the absolute immunity afforded by Government Code section 821.6:  our Supreme Court and the Court of Appeal have interpreted the provision differently.

Although our Supreme Court has not addressed the matter in nearly a quarter century, it has construed section 821.6 to provide immunity against only malicious prosecution claims.  In contrast, today's opinion faithfully follows Court of Appeal cases that broadly apply section 821.6 to immunize the police against any claim involving conduct within their duties.  I write separately primarily to explain the conflict, where each view would lead to a different outcome in this case.  Because the federal courts are following our Supreme Court's reasoning, the same issue of California law likely would be decided differently in a federal courthouse.

I can see the merit to the federal cases that apply our Supreme Court's reasoning. I join our opinion because I conclude that the Court of Appeal's longstanding circumscribing of our Supreme Court's opinions is currently state law.

I.  The Two Interpretations of Government Code 821.6 Immunity

The question in this case is whether sheriff's deputies have absolute immunity under Government Code section 821.6 (section 821.6) when sued for negligence based on their alleged mistreatment of the body of a shooting victim at a crime scene.

Section 821.6 provides absolute immunity by stating:  "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative

1

proceeding within the scope of his employment, even if he acts maliciously and without probable cause." As discussed below, our Supreme Court has interpreted section 821.6 to provide immunity against only malicious prosecution causes of action, that is, conduct occurring after a legal proceeding exists. The Court of Appeal, in contrast, holds that section 821.6 immunity covers any actions in the course of a police investigation, such as the conduct here. Recent federal court opinions have followed our Supreme Court, not the Court of Appeal.

A.  The California Supreme Court's *Sullivan* and *Asgari* Opinions

Our Supreme Court in 1974 articulated a "narrow interpretation of section 821.6's immunity, confining its reach to malicious prosecution actions." (*Sullivan v. County of Los Angeles* (1974) 12 Cal.3d 710, 721 (*Sullivan*); see also *id*. at p. 719 ("the history of section 821.6 demonstrates that the Legislature intended the section to protect public employees from liability only for *malicious prosecution*"), *id*. at p. 722 ("section 821.6 codified the recognized common law immunity of prosecutors and other law enforcement officers from malicious prosecution actions" [quoting Van Alstyne, Cal. Government Tort Liability Supp. (Cont.Ed.Bar 1969)]).)

In 1997, the only other time our Supreme Court has addressed the scope of section 821.6, it reaffirmed *Sullivan*'s interpretation that "a police officer is granted statutory immunity from liability for malicious prosecution but not for false arrest and imprisonment." (*Asgari v. City of Los Angeles* (1997) 15 Cal.4th 744, 752 (*Asgari*).) Repeatedly through *Asgari*, the court yoked section 821.6 to the tort of malicious

prosecution, referring to the statute, for instance, as a "grant of immunity for malicious prosecution." (*Asgari*, *supra*, 15 Cal.4th. at p. 753.)[1]

*Asgari* did not (like *Sullivan*) expressly use a word such as "only" to delineate that section 821.6 applies exclusively to malicious prosecution. But, despite section 821.6, *Asgari* allowed damages against officers for claims of both false arrest and intentional infliction of emotional distress (IIED) that preceded formal charges. (*Asgari*, *supra*, 15 Cal.4th at p. 760.) *Asgari* simply sharpened the distinction between malicious prosecution and these two other torts, because malicious prosecution requires the initiation of a valid or lawful process where the other torts do not require the existence of a lawful process. (*Id*. at p. 757.) Thus, *Asgari* cut off the damages available for false imprisonment and IIED at "the initiation of lawful process (malicious prosecution)." (*Id*. at p. 758.) Section 821.6, *Asgari* reasoned, "evidences a legislative intent to shield police officers from liability for damages that are attributable to a suspect's incarceration after the institution of lawful process." (*Asgari*, *supra*, 15 Cal.4th. at p. 758.) In *Asgari*, that

---

[1] (See also *Asgari*, *supra*, 15 Cal.4th. at p. 753 ["the Legislature's purpose in immunizing public employees from damages for malicious prosecution"]; *id.* at 753, fn.7 ["the Legislature's decision to immunize public employees and their employers from liability for malicious prosecution" was not made precipitously]; *ibid*. [Legislature "granted absolute immunity to public entities and their employees for malicious prosecution"]; *id*. at p. 754 [Legislature "provid[ed] immunity for malicious prosecution (§ 821.6)"]; *ibid*. ["the statutory immunity for malicious prosecution"]; *ibid*. ["the legislative decision to grant immunity to all public employees for malicious prosecution"]; *id*. at p. 756 ["California law grants immunity to any 'public employee' for damages arising from malicious prosecution (§ 821.6)"]; *id.* at 758, fn. 10 ["the statutory immunity for malicious prosecution"]; *id*. at p. 759 ["Such conduct would constitute malicious prosecution, and the officer would enjoy absolute immunity from liability under § 821.6"].)

meant a plaintiff could receive damages from officers' conduct that constituted false imprisonment and IIED, but those damages stopped when the defendant was arraigned in court, seven days after his arrest. (*Id*. at p. 757.)

B. The Court of Appeal Case Law

Today's opinion correctly observes that Court of Appeal case law has extended section 821.6's absolute immunity to acts during "an investigation that may precede the institution" of a lawful legal proceeding, such as a criminal prosecution. (Maj. opn., *ante*, at p. 10.) Thus, we hold that the deputies have absolute immunity from liability under section 821.6, even though their conduct occurred at the scene of a shooting, rather than after a prosecution began. Consequently, we hold, the County has derivative immunity under Government Code section 815.2, which absolves an entity such as a County from liability whenever its employees are immune.

The broad proposition today's opinion states is that Government Code "sections 815.2 and 821.6 immunize public employees and their employers from liability for torts committed by public employees in the course [of] their investigation concerning a judicial or administrative proceeding, even if the plaintiff is not the target of the investigation." (Maj. opn., *ante*, at p. 11.) All that matters for absolute immunity under section 821.6 is that the deputies were acting "during the course of . . . their official duties" in an investigation of a crime. (Maj. opn., *ante*, at p. 12.) Our opinion allows that actions by officers that occur "well outside" the course of an investigation may be actionable as not covered by section 821.6 immunity (maj. opn., *ante*, at p. 20), but no such actions are at issue here.

4

Today's opinion correctly reads Court of Appeal case law. The cases have expanded section 821.6's absolute immunity to actions by law enforcement in the course of an investigation, even if no "judicial or administrative proceeding" has been instituted so no malicious prosecution action might cover the conduct.

C. The Federal Courts Following *Sullivan*

In three published opinions in the past five years, the United States Court of Appeals for the Ninth Circuit has followed our Supreme Court's interpretation of section 821.6, rejecting the Court of Appeal approach. *Garmon v. County of Los Angeles* (9th Cir. 2016) 828 F.3d 837, 847, recognized that in *Sullivan* our Supreme Court had confined the reach of section 821.6 to malicious prosecution actions, but that the Court of Appeal had "interpreted section 821.6 more expansively." The court noted that several federal district courts had nevertheless followed our Supreme Court in applying section 821.6 to only malicious prosecution claims. (*Garmon v. County of Los Angeles*, *supra*, 828 F.3d. at p. 847.) The federal courts are charged with determining what meaning a state's highest court would give to a statute, and, based on *Sullivan*'s reasoning, *Garmon* concluded that our Supreme Court "would adhere to *Sullivan* even though California Courts of Appeal have strayed from it." (*Id*. at p. 847.) Thus, the Ninth Circuit held that a trial court erred in dismissing claims that were not malicious prosecution claims. (*Ibid*.)

In another published opinion, the Ninth Circuit held that section 821.6 did not apply to several state law claims based on conduct arising out of an arrest, stating that "because California's highest court has not extended § 821.6 immunity to actions outside of malicious prosecution, this immunity does not apply here." (*Sharp v. County of*

5

*Orange* (9th Cir. 2017) 871 F.3d 901, 920-921.) And in *Mendez v. County of Los Angeles* (9th Cir. 2018) 897 F.3d 1067, 1083, the Ninth Circuit held that section 821.6 does not provide officers with immunity against a negligence claim arising out of their conduct while performing an investigation, stating that the statute does not "protect officers engaged in investigations leading up to formal proceedings." (See also *Winger v. City of Garden Grove* (9th Cir. 2017) 690 Fed.Appx. 561, 563 [reversing trial court that granted summary judgment to officers under section 821.6, as against a negligence claim based on their conduct during traffic stop]; *Advanced Building & Fabrication, Inc. v. California Highway Patrol* (9th Cir. 2019) 781 Fed.Appx. 608, 611 ["Absent any claim of malicious prosecution, section 821.6 does not apply"].)

Consequently, the current law in California federal courts is that section 821.6 provides absolute immunity only against malicious prosecution claims, in accord with our Supreme Court in *Sullivan*. The Ninth Circuit is charged with predicting what a state supreme court would hold as to state law, and it has decided not only that our Supreme Court's law conflicts with our Court of Appeal's law, but that our Supreme Court would stick to its holding in *Sullivan*. If the negligence claim in this case were adjudicated in our federal district court, it appears that section 821.6 would permit it. (See *Ordonez v. Stanley* (C.D. Cal. 2020) 495 F.Supp.3d 855, 867-868 [2020 U.S. Dist. Lexis 245918 at p. 23] ["Because Plaintiff's claims under state law are not for malicious prosecution, Section 821.6 does not apply"].)

6

II.  The Court of Appeal's Limiting of *Sullivan*

How can Court of Appeal cases hold that section 821.6's absolute immunity applies to police conduct in investigations, despite *Sullivan*, our Supreme Court's case that the Ninth Circuit believes limited the immunity to only malicious prosecution cases? We are bound by holdings of our Supreme Court.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  Yet the Court of Appeal has justified applying section 821.6 absolute immunity to torts other than malicious prosecution, including where, as here, the conduct occurred when there was no court proceeding at all.

Our opinion provides the longstanding justification in Court of Appeal cases for distinguishing *Sullivan*, which is that *Sullivan* decided only that section 821.6 malicious prosecution immunity did not extend to the tort claim at issue there, false imprisonment, and was "not concerned" with whether it extended to any other tort claim.  (Maj. opn., *ante*, at p. 22.)  The view is that in *Sullivan* the Supreme Court did not hold that section 821.6 immunity was *limited* to malicious prosecution.  Instead, by describing *Sullivan* as holding that section 821.6 immunity does not apply only to the false imprisonment tort, the cases have confined that case to the narrowest description of its holding.

The Court of Appeal has read *Sullivan* this way for decades.  Our division first articulated this view over 26 years ago.  (*Amylou R. v. County of Riverside* (1994) 28 Cal.App.4th 1205, 1211 & fn.2 [immunizing acts "incidental to the investigation of the

7

crimes" and stating that *Sullivan* held that section 821.6 "does not provide immunity for claims for false imprisonment"].) Some other cases said as much even earlier.[2]

But it is not surprising that the Ninth Circuit does not read *Sullivan* this way. The Court of Appeal's reading does not come from *Sullivan* itself. The reason our Supreme Court gave for not applying section 821.6 immunity to false imprisonment was that the statute's ambit was limited to malicious prosecution. It did not reason that the Legislature intended to uniquely exempt false imprisonment from the section's immunity. The Court did recognize that false imprisonment is identified in a different section (Government Code §820.4) as one for which public employees can be liable.[3] But it did so by explaining that its "narrow interpretation of section 821.6 immunity, confining its reach to malicious prosecution actions, *finds corroboration* in another governmental immunity provision, [Government Code] section 820.4." (*Sullivan*, *supra*, 12 Cal.3d at p.

---

[2] (See, e.g., *Jenkins v. County of Orange* (1989) 212 Cal.App.3d 278, 283 [applying section 821.6 to afford absolute immunity as to a claim of negligence during an investigation and claiming that *Sullivan* "limited its holding and discussion to the lack of immunity for false imprisonment"]; *Kayfetz v. California* (1984) 156 Cal.App.3d 491, 495, 498 [applying section 821.6 immunity in libel case and noting with a "cf." citation that *Sullivan* refused to apply section 821.6 in a false imprisonment case].)

A law review article, whose author has since become a justice of this Court, traced the Court of Appeal departure from *Sullivan*'s interpretation of section 821.6 to three cases decided between 1982 and 1984 that do not even cite *Sullivan*. (Frank J. Menetrez, *Lawless Law Enforcement: The Judicial Invention of Absolute Immunity for Police and Prosecutors in California* (2009) 49 Santa Clara L. Rev. 393, 401-405.)

[3] Government Code section 820.4, the qualified immunity provided to government officials when enforcing the law, states: "A public employee is not liable for his act or omission, exercising due care, in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment."

721 [italics added].)  In other words, the court held section 821.6 immunity was limited to malicious prosecution actions, and it recognized that one of the reasons that approach was correct was that a broader view of section 821.6 would clash with Government Code section 820.4.

The Court of Appeal reading also does not come from *Asgari*, in which the Supreme Court allowed liability not just for false imprisonment, but also IIED.  The officers' conduct there occurred before a prosecution, and the court held that the *damages* for that conduct stopped when the legal process began, as later damages would be covered by a malicious prosecution claim.  (*Asgari*, *supra*, 15 Cal.4th at p. 757.)  This reasoning assumed that section 821.6 provided immunity against only a malicious prosecution charge, allowing damages before such a charge was available but not after that time.

Nevertheless, the Court of Appeal for decades has limited *Sullivan* to false imprisonment claims, and that view has never been repudiated by our Supreme Court or the Legislature.  The Ninth Circuit is applying a straightforward reading of *Sullivan*, and while we have some latitude to disregard our own decisions and agree with it, we should not lightly do so.  (See *Lucent Technologies, Inc. v. Board of Equalization* (2015) 241 Cal.App.4th 19, 35 [noting that discretion to depart from prior Court of Appeal cases is only exercised when there is "'good reason'" to do so, and that "[c]ourts are especially hesitant to overturn prior decisions where, as here, the issue is a statutory one that our Legislature has the power to alter"].)  With some reluctance, therefore, I join our opinion today, concluding that the body of Court of Appeal precedent that reads our Supreme

9

Court's *Sullivan* opinion narrowly, as addressing only false imprisonment claims, states the current law in the courts of this state.

III. The Court of Appeal's Reasons for Expanding Section 821.6 Immunity

My primary reason for writing separately today is (as discussed) to illuminate the interpretations of section 821.6 immunity and the reasoning through which the Court of Appeal has limited our Supreme Court's *Sullivan* opinion but the Ninth Circuit has not.

It is of only secondary concern whether the Court of Appeal, after limiting *Sullivan* to its facts, was correct to expand section 821.6's absolute immunity beyond malicious prosecution. Today's opinion alludes to some of the reasons in Court of Appeal cases supporting the expansive view of section 821.6 immunity. These, too, are embedded in our jurisprudence, though I do not find them especially compelling.

For instance, our opinion correctly finds important the Supreme Court's 1951 opinion in *White v. Towers* (1951) 37 Cal.2d 727 (*White*), which articulated the common law about a decade before section 821.6 was enacted in 1963. (Maj. opn., *ante*, at p. 25.) But *White* was a malicious prosecution action. It held that common law immunity for malicious prosecution extended to not just prosecutors but also to police officers. (*White*, *supra*, 37 Cal.2d at pp. 729-733.) *White* was important because it was, as *Sullivan* noted, one of several malicious prosecution cases that the Legislature expressly relied upon in fashioning section 821.6, showing that (in our Supreme Court's view) the section was meant to protect public employees from "only" malicious prosecution suits. (*Sullivan*, *supra*, 12 Cal.3d at pp. 719-720.)

10

Our opinion suggests that *White*'s public policy rationale for immunizing officers from malicious prosecution claims also counsels for shielding their conduct in police investigations. That is an arguable policy view, but it does not show that the Legislature had that view in enacting section 821.6. Another view, reflected by the common law at the time of *White*, might have considered the need for civil liability to protect the public from police conduct. (See, e.g., *Davis v. Kendrick* (1959) 52 Cal.2d 517, 518-519 ["Under common law policemen and other police officers are not immune from liability for wrongful acts causing personal injury or death"].) In fact, in 1963, when it enacted section 821.6, the Legislature provided public employees engaged in the "execution or enforcement" of the law *not* with absolute immunity but with a statutory qualified immunity, protecting them from liability so long as they exercise due care. (Gov. Code, § 820.4.) Absent our precedent, a straightforward reading of the statutes might apply Government Code section 820.4 qualified immunity to officers enforcing the law and section 821.6's absolute immunity once a legal proceeding is initiated.

Our opinion also alludes to a textual argument purporting to support an expansive reading of section 821.6. The argument is that the term "even if he acts maliciously" in section 821.6 indicates that some acts that are not "malicious," such as a negligence claim, must be covered. A relatively early case, however, explained that the wording was meant to cover those who act negligently as part of the prosecution of an action, and thus are even less culpable than those who act maliciously; still, the section is limited to covering a person who "institutes or takes part in criminal actions." (*Johnson v. City of Pacifica* (1970) 4 Cal.App.3d 82, 86-87.)

11

In fact, the text of section 821.6 is problematic for the expansive Court of Appeal view that we apply. The text of the statute provides immunity where injuries are "caused" by "instituting or prosecuting any judicial or administrative proceeding." (§ 821.6.) In accord with Court of Appeal case law, we interpret those words as covering conduct "in the course of" instituting or prosecuting a proceeding, including an investigation that "may precede the institution of any such proceeding." (Maj. opn., *ante*, at p. 10.) That is, despite the causation requirement of the provision, there apparently need not even ever be such a proceeding at all. Elsewhere, we describe the immunity as covering conduct during official investigations "related to" judicial or administrative proceedings. (Maj. opn., *ante*, at p. 22.) This also is different than the textual requirement of an injury "caused" by instituting or prosecuting a proceeding, which (as construed by *Asgari*) would seem to mean harm occurring after a proceeding has commenced.

Once again, however, today's opinion correctly articulates the reasoning of decades of opinions that not only have cabined the Supreme Court's *Sullivan* opinion to its facts, but also have expanded section 821.6's absolute immunity to police officer conduct in investigations. Working on a blank slate, I would not constrict our Supreme Court's opinion to its barest holding, and I would follow the text of section 821.6. But 36 years of precedent is persuasive when you sit on the court that issued it.

The Ninth Circuit has predicted that our Supreme Court instead would stick to its 47-year-old approach in *Sullivan* limiting section 821.6 absolute immunity to the malicious prosecution tort. I do not know what, if anything, our Supreme Court will do

12

in this area.  But at this point, I believe that any correction to the Court of Appeal's decades-old, expansive application of section 821.6 will have to come from our Supreme Court, rather than from us.

RAPHAEL                           
J.